# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### Richmond Division

|  |  |  |
|---|---|---|
| MASSEY COAL SALES COMPANY, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:08cv790 |
| | ) | |
| CEDAR BAY GENERATING COMPANY, | ) | |
| LIMITED PARTNERSHIP, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## CEDAR BAY GENERATING COMPANY'S
## OPPOSITION TO MASSEY'S MOTION FOR A
## PRELIMINARY INJUNCTION PENDING ARBITRATION

James W. Draughn, Jr., P.C.
   (VSB Bar No. 33205)
Ashley C. Parrish
   (VSB Bar No. 43089)
Scott M. Abeles
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W., Suite 1200
Washington, D.C.  20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200

Robert A. Dybing
   (VSB Bar No. 32712)
Christopher M. Malone
   (VSB Bar No. 18678)
THOMPSON MCMULLAN, P.C.
100 Shockoe Slip
Richmond, Virginia  23219
Telephone: (804) 698-6248
Facsimile: (804) 780-1813

*Counsel for Cedar Bay Generating Company*

Dated: December 15, 2008

## TABLE OF CONTENTS

INTRODUCTION ....................................................................................................................1

BACKGROUND ....................................................................................................................3

LEGAL STANDARD ..............................................................................................................6

ARGUMENT ..........................................................................................................................7

I.      Massey Has Not Satisfied The Standard For Obtaining An Injunction Pending
        Arbitration. ..................................................................................................................7

        A.      Massey Has Not Shown That It Will Suffer Irreparable Harm. ...........................8

                1.      Massey Has Not Shown That Arbitration Will Be A "Hollow
                        Formality" Absent Injunctive Relief. ...........................................................9

                2.      Massey's Waiver Of Certain Types Of Damages Is Not A Proper
                        Basis For Finding Irreparable Harm. ..........................................................11

                3.      Alleged Uncertainty In Damages In The Period After Arbitration
                        Is Not A Basis For An Injunction Pending Arbitration. ...........................13

        B.      The Balance of Harms Weighs Decisively In Favor Of Denying
                Massey's Request For An Injunction. ...............................................................15

                1.      Cedar Bay Will Suffer Substantial Harm From Entry Of The
                        Requested Injunction. .................................................................................15

                2.      Massey's Delay In Seeking Injunctive Relief Weighs Heavily
                        Against Its Request. .....................................................................................17

        C.      Massey Has Not Demonstrated A Substantial Probability Of Success
                On The Merits. ..................................................................................................18

                1.      Cedar Bay Has An Unambiguous Right To Terminate The
                        Agreement As Of December 31, 2008. .......................................................19

                2.      Cedar Bay Is Not Required To Seek "Pre-Clearance" For
                        Termination Through Arbitration. ..............................................................23

                3.      Massey Has Waived Any Right To Specific Performance Pending
                        Arbitration. ..................................................................................................24

        D.      The Public Interest Strongly Favors Denying Massey's Request For A
                Preliminary Injunction. ....................................................................................26

II.     Massey Is Not Entitled To Injunctive Relief Unless It Posts A Bond To Cover
        The Full Amount Of Potential Harm, And Any Injunctive Relief Must Be
        Strictly Limited. ..........................................................................................................28

CONCLUSION .....................................................................................................................30

# TABLE OF AUTHORITIES

**Cases**

*Abex Corp./Jetway Div. v. Controlled Sys., Inc.*,
    1993 WL 4836 (4th Cir. Jan. 12, 1993) .......................................................................... 27

*Advance Global Technologies, LLC v. XM Satellite Radio, Inc.*,
    2007 WL 3196208 (S.D.N.Y. Oct. 29, 2007) ........................................................... 12, 13

*Alco Standard Corp. v. Schmid Bros., Inc.*,
    647 F. Supp. 4 (S.D.N.Y. 1986)...................................................................................... 22

*American Family Life Assur. Co. of Columbus v. Teasdale*,
    733 F.2d 559 (8th Cir. 1984) .......................................................................................... 26

*Argonaut P'ship, L.P. v. Sidek*,
    1996 WL 617335 (S.D.N.Y. Oct. 25, 1996) ................................................................... 20

*Atwood Turnkey Drilling, inc. v. Petroleo Brasileiro, S.A.*,
    875 F.2d 1174 (5th Cir. 1989) ........................................................................................ 16

*Baer v. National Bd. of Med. Exam'rs*,
    392 F. Supp. 2d 42 (D. Mass. 2005) .............................................................................. 18

*Big Apple Car, Inc. v. City of New York*,
    204 A.D.2d 109, 611 N.Y.S.2d 533 (N.Y. App. Div. 1994) .......................................... 22

*Blackwelder Furniture Co. v. Seilig Manufacturing Co.*,
    550 F.2d 189 (4th Cir. 1977) ....................................................................................... 6, 7

*Caballo Coal Co. v. Indiana Michigan Power Co.*,
    305 F.3d 796 (8th Cir. 2002) ........................................................................... 1, 2, 10, 14

*Campaniello Imports, Ltd. v. Saporiti Italia S.p.A.*,
    117 F.3d 655 (2d Cir. 1997)............................................................................................ 12

*Citadel MCH Servs., Inc. v. Healthcare Mgmt. Alternatives, Inc.*,
    1992 WL 346806 (E.D. Pa. Nov. 12, 1992) ................................................................... 26

*Cohen v. Kranz*,
    189 N.E.2d 473 (N.Y. 1963)........................................................................................... 20

*Cubic Toll Systems v. Virginia DOT*,
    37 Va. Cir. 522 (Cir. Ct. Fairfax Co. 1993)................................................................... 12

*Direx Israel, Ltd. v. Breakthrough Med. Corp.*,
    952 F.2d 802 (4th Cir. 1992) ............................................................................... 7, 8, 18

*Erving v. Virginia Squires Basketball Club*,
    468 F.2d 1064 (2d Cir. 1972) ...................................................................... 9, 10

*F.H.R. Auto Sales, Inc. v. Scutti*,
    534 N.Y.S.2d 266 (App. Div. 1988) .............................................................. 19

*Faulkner v. Jones*,
    10 F.3d 226 (4th Cir. 1993) ............................................................................ 8

*Grand River Enter. Six Nations, Ltd. v. Pryor*,
    481 F.3d 60 (2d Cir. 2007) .......................................................................... 6, 8

*Granite Constr. Co. v. U.S.*,
    962 F.2d 998 (Fed. Cir. 1992) ...................................................................... 17

*Harbor Court Assocs. v. Leo A. Daly Co.*,
    179 F.3d 147 (4th Cir. 1999) ........................................................................ 26

*HCI Techs, Inc. v. Avaya, Inc.*,
    446 F. Supp. 2d 518 (E.D. Va. 2006) ........................................................... 11

*Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*,
    174 F.3d 411 (4th Cir. 1999) ........................................................................ 28

*Horowitz v. New York Blood Ctr., Inc.*,
    2003 WL 22287468 (N.Y. Sup. Ct. Oct. 2, 2003) ........................................ 22

*Hotjobs.com Ltd v. Digital City, Inc.*,
    53 Va. Cir. 36 (Cir. Ct. Fairfax Co. 2000) ................................................... 12

*Hunter Group, Inc. v. Smith*,
    1998 WL 682154 (4th Cir. Sept. 23, 1998) ................................................... 8

*In re Adelphia Commc'ns Corp.*,
    361 B.R. 337, 368 n.166 (S.D.N.Y. 2007) .................................................... 28

*In re Microsoft Corp. Antitrust Litig.*,
    333 F.3d 517 (4th Cir. 2003) ......................................................... 1, 6, 8, 25

*Int'l Ass'n of Machinists & Aerospace Workers v. Panoramic Corp.*,
    668 F.2d 276 (7th Cir. 1981) ........................................................................ 30

*Joseph Victori Wines, Inc. v. Vina Santa Carolina S.A.*,
    933 F. Supp. 347 (S.D.N.Y. 1996) ............................................................... 22

*Litho Prestige, Div. of Uimedia Group, Inc. v. News Am. Publ'g, Inc.*,
    652 F. Supp. 804 (S.D.N.Y. 1986) ........................................................... 8, 11

*Majorica, S.A. v. R.H. Macy & Co.*,
762 F.2d 7 (2d Cir. 1985) ......................................................... 17

*Manion v. Nagin*,
255 F.3d 535 (8th Cir. 2001) ..................................................... 24

*McNally Wellman Co., A Div. of Boliden Allis, Inc. v. N.Y. State Elec. & Gas Corp.*,
63 F.3d 1188 (2d Cir. 1995)....................................................... 12

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bradley*,
756 F.2d 1048 (4th Cir. 1985) ........................................... 9, 24, 29

*MicroStrategy, Inc. v. Motorola, Inc.*,
245 F.3d 335 (4th Cir. 2001) ..................................................... 18

*Morgan Stanley Capital Group, Inc. v. Public Util. Dist. No. 1 of Snohomish County*,
128 S. Ct. 2733 (2008)............................................................. 27

*Morrison Home Ctr. v. Hilti, Inc.*,
1998 WL 397894 (E.D. La. July 15, 1998) ..................................... 24

*Newmont Mines Ltd. v. Hanover Ins. Co.*,
784 F.2d 127 (2d Cir. 1986)....................................................... 23

*North Carolina Mail Haulers & Postal Labor Local 8001 v. East Coast Leasing, Inc.*,
2006 WL 3068497 (M.D.N.C. Oct. 27, 2006) ................................. 29

*PaineWebber, Inc. v. Nwogugu*,
1998 WL 193110 (S.D.N.Y. Apr. 22, 1998)..................................... 16

*Paradise Distribs., Inc. v. Evansville Brewing Co.*,
906 F. Supp. 619 (N.D. Okla. 1995)............................................. 13

*Peabody Coalsales Co. v. Tampa Elec. Co.*,
36 F.3d 46 (8th Cir. 1994) ......................................................... 24

*Pisgah Labs, Inc. v. Pharmaforce, Inc.*,
2005 WL 3116584 (W.D.N.C. Nov. 22, 2005)................................. 29

*Provident Pharm., Inc. v. Amneal Pharm., LLC*,
2008 WL 3843505 (E.D. Va. Aug. 15, 2008)............................... 17, 18

*PT Kaltim Prima Coal v. AES Barbers Point, Inc.*,
180 F. Supp. 2d 475 (S.D.N.Y. 2001)........................................... 22

*Public Serv. Co. of New Hampshire v. Patch*,
167 F. 3d 15 (1st Cir. 1998)....................................................... 16

iv

*Quince Orchard Valley Citizens Ass'n, Inc. v. Hodel*,
    872 F.2d 75 (4th Cir. 1989) ............................................................... 2, 17

*RGI, Inc. v. Tucker & Assocs., Inc.*,
    858 F.2d 227 (5th Cir. 1988) ................................................................ 23

*Safeway, Inc. v. CESC Plaza Ltd. P'ship*,
    261 F. Supp. 2d 439 (E.D. Va. 2003) ................................................ 8, 13, 15

*SAIA Motor Freight Lines, Inc. v. Benesight, Inc.*,
    2001 WL 1223582 (E.D. La. Oct. 12, 2001) .................................... 24

*Sauer-Getriebe KG v. White Hydraulics, Inc.*,
    715 F.2d 348 (7th Cir. 1983) ............................................................ 9, 10

*Scotts Co. v. United Indus. Corp.*,
    315 F.3d 264 (4th Cir. 2002) ............................................................... 15

*Southtech Orthopedics, Inc. v. Dingus*,
    428 F. Supp. 2d 410 (E.D.N.C. 2006) ................................................... 18

*Stop-N-Go of Madison, Inc. v. Uno-Ven Co.*,
    184 F.3d 672 (7th Cir. 1999) ............................................................... 26

*Taylor-Edwards Warehouse & Transfer Co. v. Burlington N., Inc.*,
    715 F.2d 1330 (9th Cir. 1983) .............................................................. 17

*Toyomenka Pac. Petroleum, Inc. v. Hess Oil Virgin Islands Corp.*,
    771 F. Supp. 63 (S.D.N.Y. 1991)........................................................ 19

*United States ex rel. Rahman v. Oncology Assocs., P.C.*,
    198 F.3d 489 (4th Cir. 1999) ............................................................... 25

*Village of Hamburg v. American Ref-Fuel Co. of Niagara*,
    284 A.D.2d 85, 727 N.Y.S.2d 843 (2001) .......................................... 29

*W.R. Grace & Co. v. Local Union 759, Int'l Union of the United Rubber,
    Cork, Linoleum and Plastic Workers of Am.*,
    461 U.S. 757 (1983)........................................................................... 28

*XCO Int'l. Inc. v. Pacific Scientific Co.*,
    369 F.3d 998 (7th Cir. 2004) ............................................................... 27

**Rules**

Fed. R. Civ. P. 65(c) .......................................................................... 28

**Treatises**

22 N.Y. Jur. § 321 (1996) ........................................................................................... 20

Farnsworth , E. Allen,
    Contracts § 12.8 (2d ed. 1990)........................................................................ 26

Restatement of Contracts 2d, § 348(2) ...................................................................... 17

Williston on Contracts 4th § 38:16 ........................................................................... 19

## INTRODUCTION

Massey's request for a preliminary injunction focuses at length on a non-issue: whether the parties have agreed to arbitrate. Cedar Bay stands ready to arbitrate any dispute with Massey, including whether Cedar Bay has lawfully terminated their Agreement. The question before the Court is not whether the parties agreed to arbitrate, but whether Cedar Bay is entitled to terminate the Agreement effective "as of December 31, 2008," as the contract expressly states, or whether Massey is entitled to an injunction preventing termination pending arbitration. Massey Br. 15. The answer is straightforward: For the reasons set forth below, Massey has not made the rigorous showing required to obtain the "extraordinary" remedy of a preliminary injunction. *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 524 (4th Cir. 2003).

***First***, Massey has not shown that it faces irreparable harm. Its contract with Cedar Bay accounts for                    of Massey's total coal production; terminating the Agreement does not threaten Massey's financial viability; and Massey can readily mitigate its damages (if any) by selling coal to other customers. *See* Gasbarro Decl. ¶¶ 10, 54. Moreover, money damages are an adequate remedy for any injury to Massey. In fact, any damages to which Massey may be entitled are calculable using the formula that both parties agreed would determine damages if either party failed to perform its material obligations, having waived their rights to seek any other legal or equitable remedies. *See* Agreement, Arts. 8.4, 8.5, 8.7. The most relevant authority is not the thirty-six-year-old Julius Erving case, on which Massey relies, but the Eighth Circuit's 2002 decision in *Caballo Coal Co. v. Indiana Michigan Power Co.*, 305 F.3d 796 (8th Cir. 2002), rejecting a coal supplier's request for a preliminary injunction to prevent the termination of a 40-year coal supply agreement pending trial. Rejecting the very arguments that Massey advances here, the Eighth Circuit denied the injunction because termination did not "jeopardize" the supplier's financial viability, and because any damages in the interim between

termination and trial could be adequately compensated by a post-trial award of damages or permanent injunctive relief. *Id*. at 801.

**Second**, the balance of harms weigh decisively in Cedar Bay's favor. Massey faces no irreparable harm, but granting a preliminary injunction will cause substantial injury to Cedar Bay. Cedar Bay has entered an agreement to purchase its coal requirements from another supplier in order to satisfy its obligations under a contract with its electricity customer, Florida Power & Light. If this Court requires Cedar Bay to continue purchasing coal from Massey, then Cedar Bay would be forced into the untenable position of carrying the expense of purchasing some                      annually that it cannot afford, cannot store, does not need, and cannot use. *See* Gasbarro Decl. ¶¶ 58, 59. Moreover, Massey knew on October 8, 2008 that Cedar Bay intended to terminate the Agreement, yet it waited nearly two months to ask this Court to stop the termination. Massey offers no justification for its extended delay in seeking extraordinary relief from this Court, which is an independent basis for denying a preliminary injunction. *See Quince Orchard Valley Citizens Ass'n, Inc. v. Hodel*, 872 F.2d 75, 80 (4th Cir. 1989).

**Third**, Massey has not made the "strong showing" required to demonstrate a likelihood of success on the merits. The unambiguous terms of the parties' Agreement state that if the parties did not reach agreement on new terms by October 1, 2008, either party had a right to terminate, effective "as of December 31, 2008." Agreement, Art. 3.2(b). No such agreement was ever reached. Although Massey states the parties reached an "oral agreement" on or about September 26, 2008, *see* Massey Br. 8, Cedar Bay disputes this contention. Correspondence between the parties on September 30 and October 3 show beyond doubt that the parties had not reached agreement; in fact, Massey insisted that no agreement would be effective until reduced to a "written," executed contract. *See* Gasbarro Decl. ¶ 43. In any event, Massey has pointed to

nothing in the Agreement demonstrating that arbitration is a prerequisite to termination or that specific performance should be ordered pending arbitration. To the contrary, the Agreement makes clear that Massey waived its right to specific performance, *see* Agreement, Art. 8.4; that the agreed-upon formula for calculating direct monetary damages is Massey's "sole and exclusive remedy," *id.*, Art. 8.7; and that "all other remedies … at law or equity are waived." *Id.* Massey is not entitled to obtain equitable relief that it has expressly waived by contract.

   ***Fourth***, the public interest strongly favors denying preliminary relief. Massey's lawsuit is directly at odds with the public interest in enforcing the terms of written contracts, because it effectively asks the Court to rewrite the Agreement's termination, arbitration, and remedy provisions. Termination clauses are especially important in the energy industry because terminating parties must have the flexibility to arrange for replacement suppliers without worry that the terminated supplier will attempt to resurrect the agreement. If Massey is able to circumvent the parties' Agreement and obtain a preliminary injunction, the Court's order could have a destabilizing effect on other energy contracts in which such provisions are common.

## BACKGROUND

   Massey is one of the Nation's largest coal producers. It sells coal, and lots of it. In 2007, Massey sold approximately 40 million tons of coal. *See* Gasbarro Decl. ¶ 10. Cedar Bay is one of Massey's many customers. Cedar Bay needs coal to satisfy its contractual obligations to supply power to Florida Power & Light, a Florida utility. For the last three years, Cedar Bay has purchased

under a long-term coal supply contract the parties executed in 2003 and amended in 2005. *See id.* ¶ 10. Although that may seem like a lot of coal (and to Cedar Bay it is), it is only about of Massey's total output. *See id.*

In July of this year, as market prices for coal increased, the parties "reopened" their contract, as allowed under article 3.2(b) of the Agreement, as amended. *See* Gasbarro Decl. ¶ 27. Negotiations did not go well. Massey sought to pressure Cedar Bay into agreeing to revised contract terms that were unacceptable to Cedar Bay, including paying

*See id.* ¶¶ 31, 34-38.  The parties exchanged offers, but were unable to reach agreement on new terms before October 1, 2008.  *See id.* ¶¶ 31, 39.

Massey suggests the parties reached an oral agreement on new terms on or about September 26, 2008.  *See* Massey Br. 8 (citing Sears Decl. ¶ 18).  But that simply is not true; no agreement was ever reached.  *See* Gasbarro Decl. ¶ 40.  Indeed, correspondence shows that, on both September 30 and October 3, 2008, Massey was still submitting offers and the parties had not agreed to any new terms governing their relationship going forward.  *See id.* ¶¶ 41, 43.  Any doubt whether the parties reached an oral agreement by October 1, 2008 is dispelled by Massey's insistence, upon forwarding a draft proposal on October 3, 2008 for Cedar Bay's "review and consideration," that the "terms and conditions set forth" did "not constitute a binding offer or acceptance on behalf of either party."  *Id.* ¶ 43 (quoting 2008-10-03 Email from Smith/Dougherty to Gasbarro).  Massey repeatedly stated in correspondence that a "binding contractual commitment" would arise only if "all the terms and conditions of a contract have been mutually agreed upon, as evidenced" by a written, executed contract.  *Id.*  It is undisputed that Massey and Cedar Bay have never executed a "mutually agreed upon" written contract, embodying an agreement on new terms.  *See id.* ¶¶ 39-40.

That no agreement was reached by October 1, 2008 is significant because the Agreement contains a termination provision allowing either Massey or Cedar Bay to terminate "for any

reason" and acting in their "sole discretion" if they did not reach agreement on new terms by that date:

> *In any event*, if the parties have not agreed on such new terms by October 1, 2008, either party may, *for any reason*, and *acting in its sole discretion*, terminate this Agreement as of December 31, 2008 [with five days written notice].

Agreement, Art. 3.2(b) (emphasis added); Gasbarro Decl. ¶¶ 14, 25. The Agreement also makes clear that, if either party terminates, Cedar Bay has an unconditional right to purchase coal from other suppliers: "nothing in this Agreement shall prevent" Cedar Bay "from soliciting proposals and establishing alternative Coal arrangements at any time with other suppliers for deliveries made after termination of this Agreement." Agreement, Art. 3.2. These important provisions were included to ensure that if negotiations broke down, Cedar Bay would be able to fulfill its obligations to Florida Power & Light, and Massey could not use the reopener process to gain unfair contracting advantages. *See* Gasbarro Decl. ¶ 18.

With no deal in place as of October 1, Cedar Bay informed Massey on October 8, 2008, that it intended to exercise its right to terminate "for any reason" and in its "sole discretion," with termination effective December 31, 2008. *Id.* ¶ 47. Cedar Bay then exercised its non-exclusive negotiation rights and contracted to obtain its coal requirements from a different supplier. *Id.* ¶ 56. The upshot of these events is that, beginning January 1, 2009, Massey will have to sell the coal made available by the termination of the Agreement to other purchasers in the coal commodities market. The alternative — forcing Cedar Bay to

— would impose serious harm on Cedar Bay and its constituents. *See* Gasbarro Decl. ¶¶ 58-61.

Almost two months after Cedar Bay gave notice of its intent to terminate, Massey filed a demand for arbitration, seeking specific performance. Massey is also seeking entry of a

preliminary injunction to prevent Cedar Bay from terminating pending arbitration.  In support of its motion, Massey emphasizes the parties' agreement to arbitrate their disputes, and contends that Cedar Bay may not terminate without "preclearance through arbitration."  Massey Br. 15.  Although there is no dispute that the parties agreed to arbitrate, Massey does not identify any contract provision requiring the parties to arbitrate *before* exercising their right to terminate.  Provisions requiring continued performance during resolution of a dispute over termination are frequently included in contracts negotiated between sophisticated parties, but no such provision was included here.  *See* Gasbarro Decl. ¶¶ 19, 23.

Massey also fails to mention certain other contract terms relevant to its request for a preliminary injunction.  The Agreement contains detailed provisions permitting *money* damages in the event that either party fails to perform its material obligations, and sets out a formula for calculating such damages.  *See* Agreement, Art. 8.7.  Perhaps most significantly, the Agreement provides that the money damages specified in the Agreement are the "*sole and exclusive remedy*" available, and that "*all other remedies* and damages *at law or equity* are *waived*."  *Id.*, Art. 8.7 (emphasis added).  Finally, and lest there be any doubt, the Agreement states that specific performance is not permitted unless the parties agree in writing and that, in the "absence of such an agreement," the contractual damages provision will apply.  *Id.*, Art. 8.4

## LEGAL STANDARD

A preliminary injunction "is one of the most drastic tools in the arsenal of judicial remedies."  *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (citation omitted).  Because it is an "extraordinary remedy," a preliminary injunction should "be granted only sparingly."  *Microsoft*, 333 F.3d at 524.  In this Circuit, courts considering a request for preliminary relief apply the hardship balancing test set forth in *Blackwelder Furniture Co. v. Seilig Manufacturing Co.*, 550 F.2d 189 (4th Cir. 1977).  That test focuses on four factors: (1) the

likelihood of irreparable harm to the moving party if its request for relief is denied; (2) the likelihood of harm to the non-moving party if the requested relief is granted; (3) the likelihood that the moving party will succeed on the merits of its claims; and (4) the public interest.  *Id.* at 195; *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1992).  The party seeking the preliminary injunction bears the burden of proving that *each* factor supports granting extraordinary relief.  *Direx*, 952 F.2d at 812.

In assessing Massey's injunction request, the Court should consider the terms of the parties' Agreement, including the clause providing Cedar Bay the right to terminate "for any reason" and "acting in its sole discretion," effective "as of December 31, 2008," if the parties did not reach agreement on a new contract terms by October 1, 2008.  Agreement, Art. 3.2(b).  The Court should also consider the provision of the Agreement identifying monetary damages as Massey's "sole and exclusive remedy" and providing that "all other remedies … at law or equity are waived."  *Id.*, Art. 8.7.  The Court should apply New York law in interpreting the Agreement.  *See id.*, Art. 10.7 ("This agreement and the rights and duties of the parties arising therefrom shall be governed by and construed, enforced, and performed in accordance with the laws of the State of New York without giving effect to the principles of conflicts of laws.").

## ARGUMENT

### I.   Massey Has Not Satisfied The Standard For Obtaining An Injunction Pending Arbitration.

Massey is not entitled to an injunction pending arbitration, because it has not satisfied the demanding standards for obtaining such extraordinary relief.  The Court should deny the injunction and leave the parties to the arbitration procedure and damage remedies (if any) for which they bargained.

### A.    Massey Has Not Shown That It Will Suffer Irreparable Harm.

A "clear showing of irreparable harm" is required to obtain a preliminary injunction. *Direx*, 952 F.2d at 812.  Because "irreparable harm is the single most important prerequisite," the moving party must "first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered."  *Grand River*, 481 F.3d at 66 (citation omitted). The "inability to establish irreparable harm 'is by itself a sufficient ground upon which to deny'" relief.  *Hunter Group, Inc. v. Smith*, 1998 WL 682154, at *2 (4th Cir. Sept. 23, 1998) (quoting *Faulkner v. Jones*, 10 F.3d 226, 237 (4th Cir. 1993) (Hamilton, J., dissenting)).  To satisfy this burden, Massey must establish that irreparable harm is "neither remote nor speculative, but actual and imminent."  *Direx*, 952 F.2d at 812; *Microsoft*, 333 F.3d at 530.

Massey has not met this heavy burden.  Massey's moving papers are not supported by any competent evidence establishing that it faces concrete harm — much less irreparable harm — if an injunction is not entered.  The only "evidence" that Massey provides is three conclusory statements in the declaration of Steve Sears, asserting that absent an injunction (i) the arbitration agreement will be frustrated, (ii) Massey will suffer unspecified "consequential, special, and indirect damages" (which it has waived under the parties' Agreement), and (iii) it "may be difficult … to quantify with full precision" Massey's direct damages "in the event of breach." Sears Decl. ¶ 27.  Such bare legal conclusions furnish no evidentiary basis for finding irreparable harm.  *See Litho Prestige, Div. of Uimedia Group, Inc. v. News Am. Publ'g, Inc.*, 652 F. Supp. 804, 809 (S.D.N.Y. 1986) ("[c]onclusory statements" of possible "loss represent an insufficient basis for a finding of irreparable harm").  As courts have emphasized, a party is not entitled to injunctive relief absent "specific, persuasive evidence" supporting its request.  *Safeway, Inc. v. CESC Plaza Ltd. P'ship*, 261 F. Supp. 2d 439, 471 (E.D. Va. 2003).

Even if the Court could overlook the lack of evidence, Massey's arguments are legally deficient. *First*, Massey has not shown that arbitration would be a "hollow formality" absent preliminary relief. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bradley*, 756 F.2d 1048, 1053-54 (4th Cir. 1985). *Second*, Massey's waiver of certain types of damages cannot form the basis for a finding of irreparable harm. *Third*, alleged uncertainty in damages for the period after the parties' arbitration is irrelevant to the issue of irreparable harm in the context of a request for an injunction pending arbitration.

### 1.    Massey Has Not Shown That Arbitration Will Be A "Hollow Formality" Absent Injunctive Relief.

The Agreement's provisions set out in detail the monetary damage remedies available through arbitration if either party fails "to comply with its material obligations," and make clear that the parties have waived their rights to any remedies "at law or equity" not specified in the Agreement. Agreement, Arts. 8.1(b), 8.7; *see also id.*, Art. 8.4(c) (setting forth specific remedies if Cedar Bay refuses "to accept delivery of coal"). Given these binding provisions, Massey cannot show that the arbitrators will be unable to grant it full and adequate damages (if any) to which it may be entitled. The arbitration process is not a "hollow formality" because nothing prevents the arbitrators from returning the parties to the *status quo ante* through an award of damages, if appropriate. *Merrill Lynch*, 756 F.2d at 1054.

This point is only confirmed by the cases on which Massey itself relies — *Erving v. Virginia Squires Basketball Club*, 468 F.2d 1064 (2d Cir. 1972) and *Sauer-Getriebe KG v. White Hydraulics, Inc.*, 715 F.2d 348 (7th Cir. 1983). Representing rare instances where a court has granted preliminary relief pending arbitration, these cases involve the transfer of unique assets: in one instance, basketball legend Julius Erving, and in the other, a party's contractual manufacturing rights. Both cases are readily distinguished. The issues involved in terminating a

9

commodity supply contract for coal are not comparable to a dispute involving one of the greatest basketball players of all time. There are numerous buyers to whom Massey may sell its coal; there is only one "Dr. J." *See Erving*, 468 F.2d at 1067 (noting argument that without Erving "the Squires will collapse and with them the whole American Basketball Association"). The *Erving* court found that irreparable harm was "plainly proved" and, in any event, the contract contained an express provision entitling the Virginia Squires to injunctive relief preventing Erving from playing for any other team. *Id.* at 1067. Similarly, the Seventh Circuit's decision in *Sauer-Getriebe*, enjoining the transfer of White's manufacturing rights to a third party pending arbitration, turned on evidence that Sauer could not obtain the necessary trade secrets and manufacturing rights from anyone else, and that, absent equitable relief, there would be "substantial injury" to Sauer's "reputation, good will and prestige not compensable in damages." *Sauer-Getriebe*, 715 F.2d at 351.

Here, in stark contrast, there is no evidence that Massey will suffer intangible injuries not compensable through money damages. This case involves a commodity contract, not unique assets, that accounts for a very small portion of the some 40 million tons of coal that Massey sells each year. *See* Gasbarro Decl. ¶ 10. Calculations show that the coal supplied to Cedar Bay accounted for approximately        of Massey's total coal tonnage sold in 2007. *See id.* Terminating an Agreement amounting to        of Massey's business will not expose Massey to irreparable harm. *See Caballo Coal Co. v. Indiana Mich. Power Co.*, 305 F.3d 796, 801 (8th Cir. 2002) (termination of coal supply contract would not cause irreparable harm where the coal comprised only 2% of the supplier's overall coal production).

In any event, Massey can readily sell its coal to other customers and can do so

*See* Gasbarro Decl. ¶ 54; *see also HCI Techs, Inc. v.*

*Avaya, Inc.*, 446 F. Supp. 2d 518, 521 (E.D. Va. 2006) (claim that terminating a reseller agreement would cause irreparable harm "unpersuasive" because moving party could sell and service equipment from other manufacturers). In fact, Massey's own executive, Steve Sears, told Cedar Bay

Gasbarro Decl. ¶ 55. The Agreement specifically contemplates such re-marketing if Cedar Bay does not perform, requiring Massey to take "commercially reasonable good faith" efforts to "mitigate" its damages by selling coal to other buyers. Agreement, Art. 8.4(d); *see also id*. Art. 8.4(c); *id.* Art. 10.10 ("Each Party agrees that it has a duty to mitigate damages"). The Agreement also makes clear that money damages, calculated under a specified formula, are the "sole and exclusive remedy" available to either party and that "all other remedies or damages at law or in equity are waived." *Id*., Art. 8.7. In such circumstances, because the arbitrators may award damages that will fully compensate Massey for any injury resulting from termination, Massey is not entitled to injunctive relief. *See Litho*, 652 F. Supp. at 811 ("the victim of a termination clause breach may receive injunctive relief only where money damages would provide an inadequate remedy").

## 2.    Massey's Waiver Of Certain Types Of Damages Is Not A Proper Basis For Finding Irreparable Harm.

Seeking to bridge the gap between its injunction request and the authorities on which it relies, Massey argues it faces irreparable harm because it has waived its right to seek certain types of monetary remedies. *See* Massey Br. 18; Sears Decl. ¶ 27(b). But Massey's voluntary waiver of "lost profits," "business interruptions damages," "consequential damages," and "indirect damages" does not mean that the damages recoverable through arbitration will be "inadequate." Under New York law contractual agreements to limit remedies are enforceable.

11

*See McNally Wellman Co., A Div. of Boliden Allis, Inc. v. N.Y. State Elec. & Gas Corp.*, 63 F.3d 1188, 1198 (2d Cir. 1995).  Moreover, a party cannot agree to limit its right to damages, and then argue that it has waived its way into irreparable harm.  *See Campaniello Imports, Ltd. v. Saporiti Italia S.p.A.*, 117 F.3d 655, 662 (2d Cir. 1997) (parties seeking equitable relief must demonstrate that their "own fault, neglect, or carelessness did not create the situation for which they seek equitable relief").  Granting injunctive relief here would go far beyond maintaining the *status quo* and hand Massey an improper windfall, by granting it more relief than it bargained for under the parties' Agreement.

The two Fairfax county cases cited by Massey do not involve injunctions pending arbitration and do not support its position.  In *Cubic Toll Systems v. Virginia DOT*, 37 Va. Cir. 522, 23 (Cir. Ct. Fairfax Co. 1993), the court held that plaintiff's remedy at law was inadequate because it was unclear whether the plaintiff could recover lost profits under Virginia procurement law; the plaintiff did not voluntarily waive its right to lost profits.  In *Hotjobs.com Ltd v. Digital City, Inc.*, 53 Va. Cir. 36 (Cir. Ct. Fairfax Co. 2000), the court merely noted, in discussing likelihood of success on the merits, that a contractual provision limiting liability did not preclude injunctive relief.  *Id.* at 41.  The court did not suggest that the presence of such a provision was a basis for such relief.

In contrast to the authorities cited by Massey, the Southern District of New York's decision in *Advance Global Technologies, LLC v. XM Satellite Radio, Inc.*, 2007 WL 3196208 (S.D.N.Y. Oct. 29, 2007), applying New York law, is directly on point.  Addressing whether damages provided an adequate remedy, the court noted that, although "specific performance might be warranted where money damages" are inadequate, that principle does *not* apply where the "primary 'inadequacy' of which" the moving party "complains … *i.e.*, that the Agreement

12

limits damages to lost profits, is precisely what the parties to this Agreement bargained for." *Id.* at *2. Mincing no words, the court rejected the request for an injunction: "equity will not countenance [the moving party's] transparent attempt to evade this agreement through the device of the instant action." *Id.* Indeed, where, as here, the parties' agreement specifically contemplates damages for breach, the damages specified in the agreement are by definition adequate compensation and the non-breaching party's alleged injury "is not irreparable as a matter of law." *Paradise Distribs., Inc. v. Evansville Brewing Co.*, 906 F. Supp. 619, 623 (N.D. Okla. 1995).

### 3. Alleged Uncertainty In Damages In The Period After Arbitration Is Not A Basis For An Injunction Pending Arbitration.

Massey contends that it faces irreparable harm because damages "may prove difficult, if not impossible, to prove over the remaining 16 years of the Agreement." Massey Br. 19. But this focuses on the wrong issue: the question is not whether damages "may" be "difficult to prove" over the next "16 years," but rather whether damages (if any) are incalculable during the interim period between December 31, 2008, when the contract will terminate, and the date by which an arbitration panel can be convened and render an award. Massey has made no "specific, persuasive" evidentiary showing that damages would be difficult to calculate for this interim period. *Safeway*, 261 F. Supp. 2d at 471. Nor could it make that showing. The parties' Agreement makes clear that the appropriate measure of damages flowing from any breach by Cedar Bay will be the difference between the contract price and the "reasonable market price" at which Massey is able to sell or otherwise dispose of its coal. *See* Agreement, Art. 8.4(c). Both parties have stipulated that the Agreement's specified measure of damages will be a "reasonable approximation of the anticipated harm or loss" resulting from breach and have waived "the right to contest such payments as unenforceable, an unreasonable penalty, or otherwise." *Id.*, Art. 8.5.

13

Applying the formula specified under the Agreement, damages can be calculated with sufficient precision.

This case is very similar to *Caballo Coal Co. v. Indiana Michigan Power Co.*, 305 F.3d 796 (8th Cir. 2002), where a coal supplier sought a preliminary injunction to prevent the termination of a 40-year coal supply agreement. The agreement allowed the parties to call for a reopener every five years, and there, as here, the parties were unable to reach agreement on new terms. *See id.* at 798-99. The Eighth Circuit denied the preliminary injunction request and rejected the coal supplier's claim of irreparable harm based on the "uncertainty surrounding future coal prices." *Id.* at 801. As the Court explained, "although the calculation of *future* damages may be uncertain following the resolution of the present litigation (due to the uncertainty of future coal prices) and specific performance may be an appropriate means to address *future* harm, the calculation of interim damages will not be uncertain." *Id.* (emphasis in original). A preliminary injunction was therefore not warranted because any damages incurred between "now and … trial will adequately be compensated by an award of damages and a permanent injunction." *Id.* (citation omitted). The Court went on to emphasize that because the agreement comprised 2% of the coal supplier's overall production, and because there was no evidence that the supplier's financial viability would be "jeopardized," there was no serious concern that the supplier's business would be "irreparably disrupted without a preliminary injunction." *Id.*

So too here. Even if Massey ultimately prevails in arbitration, any interim harm resulting from the Agreement's termination is compensable by a monetary award. There is no evidence, or even a plausible argument, that Massey's business will be "jeopardized" or "irreparably disrupted." And damages can be calculated using the formula prescribed by the parties'

Agreement. Accordingly, because Massey has not carried its burden to demonstrate irreparable harm, its motion can be denied on this basis alone.

**B.    The Balance of Harms Weighs Decisively In Favor Of Denying Massey's Request For An Injunction.**

Under *Blackwelder*, the Court must weigh the harm to Cedar Bay flowing from entry of the requested injunction against the harm to Massey from the Court not granting such relief. *Blackwelder*, 550 F.2d at 195. The Court may also consider other equitable factors, such as the moving party's delay in seeking relief. *See Safeway*, 261 F. Supp. 2d at 472 ("balancing of the equities also typically includes consideration of other traditional equitable factors, such as the innocence or culpability of the parties … unclean hands, delay, and laches"). Here, the balancing of these factors weighs strongly against the entry of any injunctive relief.

**1.    Cedar Bay Will Suffer Substantial Harm From Entry Of The Requested Injunction.**

Relying on a hundred-and-nine-year-old Virginia court decision, Massey argues that the Court should not consider harm to Cedar Bay because any harm would be purportedly self-inflicted. *See* Massey Br. 19. But that assertion conflicts with the Fourth Circuit's more recent admonition that it is reversible error for a district court "to conclude that any harm that would be suffered by a defendant was self-inflicted and thus entitled to lesser weight in the balancing-of-the-harms portion of the preliminary injunction calculus." *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 285 (4th Cir. 2002). As explained by the Fourth Circuit, a court considering a motion for preliminary injunction should not give "impermissibly short shrift to the question of the harm that would be visited upon the" non-moving party. *Id*.

Here, although Massey has come forward with no concrete evidence that it faces irreparable harm, there is ample evidence that granting an injunction will cause substantial harm to Cedar Bay. In order to satisfy its obligations under its contract with Florida Power & Light,

Cedar Bay has entered into an agreement to purchase its coal requirements from another supplier. *See* Gasbarro Decl ¶ 56. Cedar Bay's right to enter into that contract is protected under the Agreement: "Notwithstanding anything to the contrary herein, nothing in this Agreement shall prevent [Cedar Bay] from soliciting proposals and establishing alternative Coal arrangements at any time with other suppliers for deliveries made after termination of this Agreement." Agreement, Art. 3.2(b). If the Court were to enter an injunction requiring Cedar Bay to perform the agreement with Massey, then Cedar Bay would be left with two contracts requiring it to purchase                    , one of which would be unnecessary. *See* Gasbarro Decl. ¶ 58.

Because Cedar Bay cannot store tons of coal that it does not need and cannot use, and because it does not have the cash flow to purchase the extra coal, if it is required to perform under the Agreement, it could be forced into defaulting under its loan agreements, putting Cedar Bay's financial stability in serious jeopardy, and potentially threatening its relationship with Florida Power & Light. *See id.* ¶¶ 60-61; *PaineWebber, Inc. v. Nwogugu*, 1998 WL 193110, at *4 (S.D.N.Y. Apr. 22, 1998) (finding irreparable injury because party was at risk of defaulting on certain credit agreements); *Public Serv. Co. of New Hampshire v. Patch*, 167 F. 3d 15, 20 (1st Cir. 1998) (finding irreparable harm because party would be forced to write off millions of dollars, placing it in default of loan and credit agreements); *Atwood Turnkey Drilling, inc. v. Petroleo Brasileiro, S.A.*, 875 F.2d 1174 (5th Cir. 1989) (finding irreparable harm because party would lose most of its financing). Alternatively, even if Cedar Bay could withstand the burden of two contracts, subjecting Cedar Bay to a situation of massive oversupply is plainly harmful. Such waste can be readily avoided by declining to grant Massey's request for specific performance. *See Taylor-Edwards Warehouse & Transfer Co. v. Burlington N., Inc.*, 715 F.2d

16

1330, 1335 (9th Cir. 1983) (declining to order specific performance of unprofitable contract, as the "law does not require economic waste"); *Granite Constr. Co. v. U.S.*, 962 F.2d 998, 1007 (Fed. Cir. 1992) (declining to require strict compliance with government contract where such compliance would result in economic waste); Restatement of Contracts 2d, § 348(2) (endorsing economic waste doctrine).

A preliminary injunction would also expose Cedar Bay to other injuries. For example, if Cedar Bay is required to continue purchasing coal from Massey under the Agreement, Cedar Bay would be denied its right to terminate the Agreement "for any reason," a bargained-for right included in the 2003 Agreement and preserved in the 2005 Amendment. Gasbarro Decl. ¶ 61.

## 2. Massey's Delay In Seeking Injunctive Relief Weighs Heavily Against Its Request.

Other equitable factors relevant to the balance of harms analysis also weigh decisively in favor of denying Massey's injunction request. As courts in this and other Circuits have recognized, when a request for a preliminary injunction "is based upon an urgent need for the protection of [a] [p]laintiff's rights, a long delay in seeking relief indicates that speedy action is not required." *Quince*, 872 F.2d at 80; *Provident Pharm., Inc. v. Amneal Pharm., LLC*, 2008 WL 3843505, at *3 (E.D. Va. Aug. 15, 2008). A "[l]ack of diligence, standing alone" may preclude the granting of a preliminary injunction. *Majorica, S.A. v. R.H. Macy & Co.*, 762 F.2d 7, 8 (2d Cir. 1985).

Here, Cedar Bay notified Massey on October 8, 2008 that it intended to exercise its right to terminate the Agreement as of December 31, 2008. Gasbarro Decl. ¶ 47. Instead of promptly commencing arbitration, however, Massey waited eight weeks while Cedar Bay negotiated an agreement with another coal supplier before filing its request with this Court for extraordinary relief. Massey's unexplained delay in itself indicates that Massey is not facing imminent and

irreparable harm.  *See Provident*, 2007 WL 3843505, at *3; *see also Southech Orthopedics, Inc. v. Dingus*, 428 F. Supp. 2d 410, 420-21 (E.D.N.C. 2006) (plaintiff's delay indicated a lack of imminent and irreparable harm where the plaintiff waited at least six weeks after it knew of defendant's hostile activities before seeking injunctive relief); *Baer v. National Bd. of Med. Exam'rs*, 392 F. Supp. 2d 42, 49 (D. Mass. 2005) (medical student failed to establish irreparable harm where she delayed filing suit until three weeks prior to medical exam despite receiving the defendant's denial letter three months prior).

In short, because there is no likelihood of irreparable harm to Massey, and because harm to Cedar Bay is virtually certain, the balancing of the harms inquiry favors Cedar Bay.

### C.    Massey Has Not Demonstrated A Substantial Probability Of Success On The Merits.

Because the balance of harms weighs so decisively against injunctive relief, Massey must make a particularly "strong showing," with "clear and convincing evidence," that its claims will likely succeed on their merits.  *Direx*, 952 F.2d at 818.   Massey must therefore prove a "probability (not mere possibility) of success … on the merits" and have "a very clear and strong case."  *Id*. at 813; *see also MicroStrategy, Inc. v. Motorola, Inc.*, 245 F.3d 335, 340 (4th Cir. 2001).  As the Fourth Circuit has emphasized, "to doubt is to deny."  *Direx*, 952 F.2d at 813. Accordingly, "if there is doubt as to the probability" of the moving party's "ultimate success on the merits, the preliminary injunction must be denied."  *Id*.

For reasons explained below, Massey has no likelihood of success on the merits because (i) Cedar Bay has an unambiguous right to terminate; (ii) the Agreement does not require "pre-clearance" of termination through arbitration; and (iii) the Agreement specifically precludes the relief Massey is seeking.

### 1.    Cedar Bay Has An Unambiguous Right To Terminate The Agreement As Of December 31, 2008.

The Agreement's opening article states that the contract will remain in effect until January 31, 2025, "*unless*" it is "terminated earlier pursuant to the terms hereof."  Agreement, Art. 1 (emphasis added).   Article 3.2 includes a "reopener" that prescribes a process under which, by a specified date, the parties may negotiate new terms.  That provision, as amended, states that if the parties have not agreed to new terms by October 1, 2008, either party may terminate the agreement "*for any reason*" and "acting in its *sole discretion*":

> *In any event*, if the Parties have not agreed on such new terms by October 1, 2008, either Party may, *for any reason* and *acting in its sole discretion*, terminate this Agreement as of December 31, 2008, provided that, such Party gives prompt written notice to the other Party of its intent to terminate the Agreement at least five (5) days prior to such termination, and, provided further that, the Parties shall remain obligated to perform any obligations arising prior to such termination pursuant to the terms of this Agreement.

*Id.*, Art. 3.2(b), as amended (emphasis added).  The only condition precedent to the parties' right to terminate is thus the absence of a new agreement on terms by October 1, 2008.

Massey disputes this conclusion, arguing that the appointment of a senior executive 120 days before December 31, 2008 was a condition precedent to termination, which Cedar Bay failed to satisfy.  But, under New York law, "a contractual duty will not be construed as a condition precedent absent clear language showing that the parties intended to make it a condition."  *Toyomenka Pac. Petroleum, Inc. v. Hess Oil Virgin Islands Corp.,* 771 F. Supp. 63, 67 (S.D.N.Y. 1991) (citing *F.H.R. Auto Sales, Inc. v. Scutti*, 534 N.Y.S.2d 266 (App. Div. 1988)).  "Such terms as 'if,' 'provided that,' 'on condition that,' or some other phrase that conditions performance usually connote an intent for a condition, rather than a promise."  Williston on Contracts 4th § 38:16.  Here, the Agreement does not state that Cedar Bay shall have the right to terminate on October 1, 2008, "provided that," "on the condition that," or "if" it

19

previously served the notice of appointment of a senior executive. Instead, article 3.2(b) states that "*[i]n any event*, if the Parties have not agreed on such new terms by October 1, 2008, either Party may, *for any reason* and *acting in its sole discretion*, terminate this Agreement as of December 31, 2008." The requirement to appoint a senior executive is thus properly considered an independent duty, and not a condition precedent to the right to terminate under article 3.2(b).

Here, neither Massey nor Cedar Bay provided formal notice of an appointment of a senior executive within the ten-day window specified in article 3.2(b). *See* Gasbarro Decl. ¶ 32. The reason is simple: senior executives were already negotiating and such notice was unnecessary. *See id*. ¶ 33. More important, under New York law, Massey cannot complain about Cedar Bay's supposed non-performance of a notice obligation, which the contract imposed equally on Massey and which Massey itself did not perform. *See Cohen v. Kranz,* 189 N.E.2d 473, 476 (N.Y. 1963) ("an action for breach of contract requires a showing that plaintiff … has performed all conditions precedent and concurrent, unless excused"); *Argonaut P'ship, L.P. v. Sidek,* 1996 WL 617335, at *4 (S.D.N.Y. Oct. 25, 1996) ("where the performance of the parties is to be concurrent by the terms of the contract, the person who seeks to maintain an action for its breach has a duty to tender performance on her part") (quoting 22 N.Y. Jur. § 321 (1996)).

Massey also contends that Cedar Bay had no right to terminate because the parties purportedly reached an oral agreement on new pricing terms on or about September 26, 2008. *See* Massey Br. 11 (citing Sears Decl. ¶ 26). Cedar Bay denies that any agreement was ever reached, and Massey's own words foreclose its argument to the contrary. In a letter dated September 30, 2008 — four days after the supposed oral agreement — Massey's Thomas Dougherty made an "offer to supply [Cedar Bay] with coal," but stressed that the offer did "*not* constitute a binding offer or acceptance on behalf of either party" and that "[t]here will *not* be a

binding contractual commitment on behalf of either party until all the terms and conditions of a contract have been mutually agreed upon, as evidenced *only* by a contract executed by an authorized representative of both parties."   2008-09-30 Ltr. T. Dougherty to J. Gasbarro (emphasis added) (attached to Gasbarro Decl. as Ex. G).  Then, on October 3, 2008 — six days after the supposed oral agreement and two days after the October 1, 2008 deadline — Massey sent another offer to Cedar Bay for its "review and consideration," reiterating that the "terms and conditions set forth in this correspondence" do "*not* constitute a binding offer or acceptance on behalf of either party."   2008-10-03 Email Smith/Dougherty to Gasbarro (emphasis added) (attached to Gasbarro Decl. as Ex. H).  The October 3 offer plainly stated that a "binding contractual commitment" would arise only after "all the terms and conditions of a contract have been mutually agreed upon, as evidenced" by a written, executed contract.  *Id.*  Not surprisingly, Cedar Bay's John Gasbarro has attested that the parties did *not* reach agreement on new terms by October 1, 2008.  *See* Gasbarro Decl. ¶ 39.

Massey fails to mention, much less address, these critical facts.  It instead relies on vague assertions that, on September 26, 2008, Cedar Bay's "John Gasbarro suggested a price and structure that would be competitive," and that on some unspecified date "Massey *later* informed [Cedar Bay] that the price and structure Gasbarro had suggested was acceptable to Massey." Massey Br. 8 (emphasis added) (citing Sears Decl. ¶ 18).  Apart from being both opaque and belied by its own correspondence, Massey's suggestion that the parties reached a binding "oral agreement" is undermined by the parties' Agreement itself.  *See id.* (citing Sears Decl. ¶ 19). The Agreement states: "[n]o amendment, modification, or change to this Agreement shall be enforceable unless reduced to a writing executed by the Party against whom such amendment, modification or change is sought to be enforced."  Agreement, Art. 10.8.  Massey does not

contend that an agreement on new terms was reduced to writing. Nor could it. Massey did not forward a written *proposal* to Cedar Bay until October 3, 2008 — two days *after* Cedar Bay's right to terminate "for any reason" and in its "sole discretion" ripened. *See* Gasbarro Decl. ¶ 43.

Because the parties did not reach agreement before October 1, 2008, Massey is reduced to arguing that Cedar Bay did not negotiate in good faith. *See* Massey Br. 10. But, here again, Massey offers no competent evidence supporting its bare, conclusory allegations. *See Horowitz v. New York Blood Ctr., Inc.*, 2003 WL 22287468, at *5 (N.Y. Sup. Ct. Oct. 2, 2003) ("cause of action for breach of the implied covenant of good faith and fair dealing fails to state a cause of action since it is unduly vague, lacking in specificity and is conclusory"). Because Cedar Bay has an express right to terminate as of December 31, 2008 "for any reason and acting in its sole discretion," good faith has no role to play in the termination analysis. The duty of good faith and fair dealing "cannot be used to create independent obligations beyond those agreed upon and stated in the express language of the contract" and, therefore "cannot add to, detract from, or alter the terms of the contract itself." *PT Kaltim Prima Coal v. AES Barbers Point, Inc.*, 180 F. Supp. 2d 475, 483 (S.D.N.Y. 2001). Moreover, under New York law, a "party has an absolute, unqualified right to terminate a contract on notice pursuant to an unconditional termination clause without court inquiry into whether the termination was activated by an ulterior motive." *Big Apple Car, Inc. v. City of New York*, 204 A.D.2d 109, 111, 611 N.Y.S.2d 533 (N.Y. App. Div. 1994); *Alco Standard Corp. v. Schmid Bros., Inc.*, 647 F. Supp. 4, 7 (S.D.N.Y. 1986) (the court should not "qualify an otherwise absolute power to terminate by requiring termination to be in good faith") (citation omitted); *Joseph Victori Wines, Inc. v. Vina Santa Carolina S.A.*, 933 F. Supp. 347, 353 (S.D.N.Y. 1996) (termination clause "contains no implied requirement that it must be exercised in good faith" under New York law).

22

>2.    **Cedar Bay Is Not Required To Seek "Pre-Clearance" For Termination Through Arbitration.**

Even if Cedar Bay's actions could plausibly be viewed as a breach (they cannot), nothing in the parties' Agreement requires that an arbitration panel resolve that dispute *before* the contract terminates. The Agreement makes clear that termination is permitted any time after October 1, 2008, and that, provided the terminating party gives 5 days notice, termination will be effective December 31, 2008, requiring the parties to make other arrangements for buying and selling coal as of January 1, 2009. *See* Agreement, Art. 3.2(b). Under Massey's position, the structure of the Agreement makes no sense. Because the Agreement makes clear that termination is effective December 31, 2008, Massey's position assumes that the parties intended arbitration to occur on an impossibly compressed timeframe between the date after October 1, 2008 when either party notices an intent to terminate and December 31, 2008 — a period that could be as short as 5 days. That is not a plausible construction of the Agreement. *See Newmont Mines Ltd. v. Hanover Ins. Co.*, 784 F.2d 127, 135 (2d Cir. 1986) (when interpreting contracts "absurd results should be avoided").

Perhaps most significantly, although the parties' Agreement contains a detailed description of available "remedies," there is no provision requiring the parties to obtain "preclearance through arbitration." Massey Br. 15. Had Massey wanted the right to require arbitration before termination, it could have negotiated to include a provision in the Agreement. Contracts negotiated by sophisticated parties, like Massey, often include provisions requiring the contract to continue pending arbitration and the absence of such a provision in many Circuits precludes preliminary injunctive relief. *Compare RGI, Inc. v. Tucker & Assocs., Inc.*, 858 F.2d 227, 230 (5th Cir. 1988) (because parties agreed that "[i]n the event that a dispute is submitted for arbitration … this Subcontract shall continue in full force and effect until such decision is

23

rendered," termination before arbitration was inappropriate) *and Morrison Home Ctr. v. Hilti, Inc.*, 1998 WL 397894, *1 (E.D. La. July 15, 1998) (granting injunctive relief where contract stated that "[p]ending arbitration, either party may seek injunctive relief in a court of competent jurisdiction") *with SAIA Motor Freight Lines, Inc. v. Benesight, Inc.*, 2001 WL 1223582, at *7 (E.D. La. Oct. 12, 2001) (denying injunction "because there is no agreement between plaintiff and defendant to permit injunctive relief pending arbitration").  The Eighth Circuit has required such "qualifying language" in a series of cases.  *See Peabody Coalsales Co. v. Tampa Elec. Co.*, 36 F.3d 46, 47-48 (8th Cir. 1994) (in contract case involving coal, contract provided that performance "shall be continued in full by the parties during the dispute resolution process," entitling movant to an injunction); *Manion v. Nagin*, 255 F.3d 535, 539 (8th Cir. 2001) (denying injunction where relevant contract stated only "that a party may request such [interim] relief").

To be sure, the Fourth Circuit has held that the absence of a provision requiring the *status quo* to be maintained pending arbitration is not an absolute bar to relief if the other strict requirements for a preliminary injunction are satisfied.  *See Merrill Lynch*, 756 F.2d at 1051-53. Nonetheless, the absence of any such provision certainly sheds light on the parties' intent.  More fundamentally, Cedar Bay is aware of no authority (and Massey cites none) holding the opposite — that merely because parties agree to arbitrate their disputes they must seek "preclearance through arbitration" before exercising a contractual right to terminate.  Massey Br. 15.  That startling suggestion, on which Massey's motion hinges, has no legal basis.

### 3. Massey Has Waived Any Right To Specific Performance Pending Arbitration.

Article 8.4 states that "remedies set forth" therein "shall be the Non-Defaulting Party's exclusive monetary remedies for the Defaulting Parties' failure to deliver or receive under this

Agreement."  Agreement, Art. 8.4.  The provision goes on to set out a formula for calculating

money damages and states that, absent a written agreement, specific performance is unavailable:

> As an alternative to the damages provisions below, *if the Parties mutually agree in writing*, the Non-Defaulting Party may schedule deliveries or receipts, as the case may be, pursuant to such terms as the Parties agree in order to discharge some or all of the obligation to pay damages.  *In the absence of such an agreement, the damages provision of this Section shall apply*.

*Id.* § 8.4(a)  (emphasis added).  Article 8.7 further confirms that equitable remedies, such as

specific performance, are not available: the "express remedy or measure of damages" provided in

the Agreement are "the *sole* and *exclusive* remedy" and "all other remedies or damages at law *or

equity* are waived."  *Id.* § 8.7 (emphasis added).  The Agreement also prohibits Massey from

interfering with Cedar Bay's ability to purchase coal from other suppliers after termination:

"Notwithstanding anything to the contrary herein, nothing in this Agreement shall prevent

[Cedar Bay] from soliciting proposals and establishing alternative Coal arrangements at any time

with other suppliers for deliveries made after termination of this Agreement."  *Id.*, Art. 3.2(b).

These provisions also would make no sense if the parties intended to preclude termination

pending arbitration.

    In short, because Massey has waived all equitable remedies, its request that the arbitrators

award a "permanent injunction" requiring Cedar Bay to continue performing under the

Agreement cannot possibly succeed on its merits.  Preliminary relief should therefore be denied.

*See In re Microsoft*, 333 F.3d at 525 ("preliminary relief may never be granted that addresses

matters 'which in no circumstances can be dealt with in any final injunction that may be

entered'"); *United States ex rel. Rahman v. Oncology Assocs., P.C.*, 198 F.3d 489, 498 (4th Cir.

1999) (preliminary injunction must grant "interim relief of the same character as that which may

be granted finally").

**D.    The Public Interest Strongly Favors Denying Massey's Request For A Preliminary Injunction.**

Massey admits that the public interest is served by enforcing written contracts.  *See* Massey Br. 21 (citing cases).  But its lawsuit is directly at odds with that interest.  As noted above, Cedar Bay exercised its unambiguous right under article 3.2(b) to terminate after the parties failed to reach agreement on new contract terms.  Accordingly, although Massey's "motion seems to request that the contract be enforced, in effect [Massey] is asking this court to rewrite, and indeed remove, the contract's termination and arbitration provision."  *Citadel MCH Servs., Inc. v. Healthcare Mgmt. Alternatives, Inc.*, 1992 WL 346806, at \*3 (E.D. Pa. Nov. 12, 1992) (denying request for injunction).  There is no public interest in rewriting a contract's plain terms.  *See Harbor Court Assocs. v. Leo A. Daly Co.*, 179 F.3d 147, 150 (4th Cir. 1999) (discussing "the public interest in having individuals exercise broad powers to structure their own affairs by making legally enforceable promises").  Nor is there a public interest in the prosecution of baseless litigation.  As courts have recognized, "the entire public inevitably suffers" where, as here, "a vindictive plaintiff squanders limited judicial resources by prosecuting frivolous lawsuits."  *American Family Life Assur. Co. of Columbus v. Teasdale*, 733 F.2d 559, 570 (8th Cir. 1984).

But even if Cedar Bay's termination of the contract were somehow deemed a breach, the public interest favors "efficient breach" over economic waste.  *See Stop-N-Go of Madison, Inc. v. Uno-Ven Co.*, 184 F.3d 672, 680 (7th Cir. 1999) (because efficient "breach makes society better off, the law does not treat it as disfavored"); E. Allen Farnsworth, Contracts § 12.8 at 194-95 (2d ed. 1990) ("courts have not infringed on the freedom to keep or break a contract traditionally afforded a party by the common law and endorsed by the notion of efficient breach").  As the Seventh Circuit's Judge Posner has explained, "if there is a very stiff penalty for breach, parties

26

will be discouraged from committing 'efficient' breaches, that is, breaches that confer a greater benefit on the contract breaker than on the victim of the breach," which, assuming the victim is made whole, "should be encouraged." *XCO Int'l. Inc. v. Pacific Scientific Co.*, 369 F.3d 998, 1001 (7th Cir. 2004); *Abex Corp./Jetway Div. v. Controlled Sys., Inc.*, 1993 WL 4836, at *10 n.11 (4th Cir. Jan. 12, 1993) (unpublished) ("awarding more than expectation damages prevents an efficient breach"). For these reasons, "injunctions are not routinely granted in contract cases"; instead, "the party who breaks his contract is usually allowed to walk away from it, provided only that he compensates the other party for the cost of the breach to that party." *XCO Intern.*, 369 F.3d at 1001.

Finally, the public interest weighs strongly against preliminary relief because the ability to freely terminate contracts during a contract reopener process and obtain supply from other sources, where parties have expressly reserved their right to terminate, is vital in an industry with fluctuating prices and variable supply and demand. Compelling the performance of an energy supply agreement — notwithstanding the terms of an unambiguous termination provision — threatens to destabilize the industry, which relies on bilateral termination clauses in long-term contracts. *See Morgan Stanley Capital Group, Inc. v. Public Util. Dist. No. 1 of Snohomish County*, 128 S. Ct. 2733 (2008) (noting the importance of contract stability in energy markets). Such clauses are essential to maintaining competition, preserving contract flexibility as market prices fluctuate, and serving as a disciplining devices on all parties, making exploitation of disadvantaged parties a less inviting, less successful, strategy. Here, the aftershocks of any order granting Massey's injunction request would send tremors radiating out from this case into the larger coal and energy markets, suggesting that a party's right to terminate cannot be exercised unless it obtains "preclearance through arbitration." Depending on their magnitude, those

aftershocks risk unsettling crucial parts of what have been thought to be settled rules and practices governing the termination of energy supply contracts.

## II.    Massey Is Not Entitled To Injunctive Relief Unless It Posts A Bond To Cover The Full Amount Of Potential Harm, And Any Injunctive Relief Must Be Strictly Limited.

Massey has failed to propose a posting of a bond that is sufficient to cover the potential harm to Cedar Bay.  But the law in this Circuit is clear: a court "must fix a bond whenever it grants a preliminary injunction." *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 (4th Cir. 1999); Fed. R. Civ. P. 65(c).  The Fourth Circuit has held that "[t]his rule is mandatory and unambiguous" and that failing "to require a bond upon issuing injunctive relief is reversible error." *Hoechst Diafoil*, 174 F.3d at 421.  The bond requirement is important, as "[a] party injured by the issuance of an injunction later determined to be erroneous has no action for damages in the absence of a bond." *W.R. Grace & Co. v. Local Union 759, Int'l Union of the United Rubber, Cork, Linoleum and Plastic Workers of Am.*, 461 U.S. 757, 770 n.14 (1983).  Accordingly, a bond should be of sufficient size to cover not only "the potential incidental and consequential costs" of the injunction, but also any "unjust enrichment caused by" improperly enjoining the non-moving party. *Hoechst Diafoil*, 174 F.3d at 421 n.3.

To avoid potentially grave harm to Cedar Bay, to prevent Massey's unjust enrichment, and because Cedar Bay has executed a long-term supply agreement with another company, any injunction should require a bond of at least                    *See* Gasbarro Decl. ¶ 62; *see also In re Adelphia Commc'ns Corp.*, 361 B.R. 337, 368 n.166 (S.D.N.Y. 2007) (citing cases requiring multi-million dollar bonds).  That is the minimum amount sufficient to cover the expected costs of purchasing unneeded coal from Massey at the existing contract price, assuming arbitration is completed within six months. *See id.*  Moreover, because Cedar Bay cannot store or use the excess coal supplied by Massey, if the Court grants the injunction it also should enter an order

28

authorizing Cedar Bay to resell the coal it purchases from Massey to other buyers at whatever price the market will bear.

In addition to requiring a bond and authorizing Massey to sell the coal it purchases from Massey to other buyers, if the Court takes the extraordinary step of granting a preliminary injunction, the injunction should be strictly limited.  Under no circumstances should Cedar Bay be forced to buy coal from Massey at a price any greater than the existing contract price.  Indeed, under New York law, if resort to a contractual reopener provision results in neither a new price term nor termination of the contract, the parties are required to continue performance on the existing terms. *See Village of Hamburg v. American Ref-Fuel Co. of Niagara*, 284 A.D.2d 85, 727 N.Y.S.2d 843 (2001) (where parties were unable to agree on price during reopener period, current contract price would remain in effect).  Moreover, the purpose of a preliminary injunction pending arbitration is to "further[] congressional policy by ensuring that the dispute resolution [will] be meaningful" by preserving the arbitrators' ability to "return the parties substantially to the *status quo ante*."  *Merrill Lynch*, 756 F.2d at 1054.  A forced sale at any price other than the existing contract price would not preserve the *status quo*, but instead prematurely determine the merits of the dispute.  *See Pisgah Labs, Inc. v. Pharmaforce, Inc.*, 2005 WL 3116584, at *3 (W.D.N.C. Nov. 22, 2005) (denying injunction where requested relief would effectively amount to victory for requesting party rather than preserve the status quo ante).

Similarly, any preliminary injunction must terminate as soon as a panel of arbitrators is in place.  The sole justification for an injunction pending arbitration is to protect the integrity of the arbitration process.  *Merrill Lynch*, 756 F.2d at 1053-54; *see also North Carolina Mail Haulers & Postal Labor Local 8001 v. East Coast Leasing, Inc.*, 2006 WL 3068497 (M.D.N.C. Oct. 27, 2006) ("injunctions pending arbitration are only appropriate 'when the actual or threatened harm

to the aggrieved party amounts to a frustration or vitiation of arbitration.'") (quoting *Int'l Ass'n of Machinists & Aerospace Workers v. Panoramic Corp.*, 668 F.2d 276, 286 (7th Cir. 1981)). Once a panel of arbitrators is appointed, Rule 34 of the Arbitration Rules allows the "arbitrator[s to] take whatever interim measures [they] deem[] necessary, including injunctive relief." The Court should protect the arbitrators' authority under this rule, by leaving the issue of an injunction to their discretion.

## CONCLUSION

For the foregoing reasons, Massey has not satisfied the demanding standards for extraordinary relief and its motion for a preliminary injunction should be denied.

Respectfully submitted,

CEDAR BAY GENERATING
COMPANY, LIMITED PARTNERSHIP

By ___/s/_____
          Counsel

Robert A. Dybing, VSB No. 32712
Christopher M. Malone, VSB No. 18678
*Thompson*McMullan, P.C.
100 Shockoe Slip, Third Floor
Richmond, Virginia 23219
Telephone: (804) 649-7545
Facsimile: (804) 780-1813
Email: rdybing@t-mlaw.com

James W. Draughn, Jr., P.C., VSB Bar No. 33205
Ashley C. Parrish, VSB Bar No. 43089
Scott M. Abeles
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W., Suite 1200
Washington, D.C.  20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200

Counsel for Cedar Bay Generating Company, Limited Partnership

## CERTIFICATE OF SERVICE

I certify that on December 15, 2008, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to Alan D. Wingfield, Esq., and Megan C. Rahman, Esq., Troutman Sanders LLP, P. O. Box 1122, Richmond, Virginia 23218-1122.


By: _____/s/_____

    Robert A. Dybing, VSB No. 32712
    Christopher M. Malone, VSB No. 18678
    Attorneys for Defendant
    *Thompson*McMullan, P.C.
    100 Shockoe Slip, Third Floor
    Richmond, Virginia 23219
    Telephone: (804)649-7545
    Fax: (804)780-1813
    Email: rdybing@t-mlaw.com

Dated: December 15, 2008